214 S.E.2d 823 (1975)
KENTUCKY FRIED CHICKEN OF MORGANTOWN, INC.
v.
Asunta M. SELLARO et al.
No. 13475.
Supreme Court of Appeals of West Virginia.
April 8, 1975.
Dissenting Opinion May 8, 1975.
*824 Steptoe & Johnson, Patrick D. Deem, Jackson L. Anderson, Clarksburg, for appellant.
Frank J. De Pond, Morgantown, Wilson, Frame & Rowe, Clark Frame, Morgantown, for appellees.
HADEN, Chief Justice:
Kentucky Fried Chicken of Morgantown, Inc. appeals a final order of the Circuit Court of Monongalia County overruling its motion for a new trial made pursuant to Rule 59 and its motion for amendment or additional findings of fact made pursuant to Rule 52(b) of the West Virginia Rules of Civil Procedure. The motions ruled upon had sought the court's reconsideration of that part of its previous judgment of June 21, 1973, disposing of multiple claims, which awarded appellees, Asunta M. Sellaro, Antonio M. Sellaro and Catherine J. Sellaro $18,092.50 on their counterclaim against the appellant for damages arising from a breach of a lease contract.
The appellees counter-assign error in their brief filed in this Court on January 8, 1975, likewise relating to the June 21, 1973 judgment, as such reformed a lease agreement between the parties and fixed values on additional rental assigned the Sellaros pursuant to reformation of the lease. The cross-assignments assert that the trial court's judgment was in error in failing to order removal of a property encroachment or, alternatively, in failing to properly assign rental value to the Sellaros' encroached-upon property. Kentucky Fried Chicken contends in its reply brief that the Sellaros' counter-assignments should be dismissed because they were not asserted seasonably.
*825 The controversy resulting in this appeal relates to a building encroachment and to provisions contained in a lease agreement executed by Sam Sellaro, now deceased, and Asunta M. Sellaro, his wife, as lessors with Kentucky Fried Chicken's predecessor corporation, as lessee, dated May 12, 1967, for the demise of a 40 foot by 165 foot parcel of valuable land fronting on Patteson Drive in the City of Morgantown. The leased parcel was a portion of a larger 1.38 acre tract owned by Sellaros. The smaller parcel was leased to the appellant for the construction of a building which was to be operated as a "carry-out" retail franchise for selling "Kentucky Fried Chicken" and related foodstuffs. The term of the lease was for a period of ten years, with two additional five-year renewal options. The lease also contained provisions for prospective grading and paving of the total 1.38 acre parcel, including the demised premises. The trial court's interpretation of the grading and paving provisions is the principal source of appellant's assignments of error on this appeal.
Subsequent to the execution of the lease agreement, plaintiff began construction of its building. Early during the construction period, it was discovered that the building and its appurtenances, when completed, would encroach approximately five feet upon the adjoining property owned by the lessors. A dispute over the encroachment ensued which could not be resolved amicably. Consequently, a civil action was initiated by the appellant to amend or reform the description of the lease to include the area of the encroachment upon payment of additional compensation by Kentucky Fried Chicken. In its complaint, the plaintiff lessee also asserted the lessors' obligation under the lease to grade and blacktop the 1.38 acre parcel upon which lessee was to enjoy joint and common parking privileges, with right of ingress and egress, praying that the Sellaros be ordered to complete the grading and blacktopping with "plaintiff to bear its proportionate share of the costs incurred." The Sellaros answered the complaint and counterclaimed for damages for the encroachment, removal of the encroachment and damages of $17,000.00 for reimbursement to the lessors for Kentucky Fried Chicken's proportionate share of grading and paving costs incurred in the development of the 1.38 acre parcel. In its reply to the counterclaim, Kentucky Fried Chicken admitted the encroachment but alleged it was consented to by the Sellaros. The plaintiff's reply also denied liability for grading and paving the demised premises, pleading previous payment of its proportionate share.
Upon these issues, the case was tried to the court. By the judgment order of June 21, 1973, which was based upon accompanying findings of fact and conclusions of law, the trial court ordered that the Sellaros recover the sum of $18,092.50, with interest, as the lessee's share of the grading and blacktopping expenses. The same order also "reformed" the subject lease so as to extend the westerly boundary line of the leased parcel five feet. The "rental" value fixed by the trial court for the additional 5 by 165 foot parcel was $50.00 per month recoverable from the execution date of the lease and equivalent to the front footage rental agreed to in the original lease contract.
Thereafter, appellant filed its motions for a new trial and to have certain findings of facts and conclusions of law set aside on grounds pertaining solely to the portion of the judgment awarding the Sellaros damages on the counterclaim. The order of September 18, 1973 overruled the appellant's motion. A timely appeal from that order was perfected to this Court.
The issues arising upon the appellant's petition involve the extent of its liability, if any, to the Sellaros for reimbursement of a portion of the costs allegedly incurred by the Sellaros in grading and blacktopping the 1.38 acre parcel of real estate. The provisions of the lease which deal specifically with the asserted obligation are in the following language:

*826 "6. It is agreed between the parties hereto that whereas the Lessors are planning to have the 1.38 acre parcel of real estate owned by them graded for future building purposes which includes the parcel herein leased to the Lessee, the Lessors will cause to be graded in preparation for building, the site leased herein as a part of the overall grading project and the Lessee will pay its proportionate share of the grading costs.
"7. It is agreed by and between the parties hereto that whereas the Lessors are planning to cause the said 1.38 acre parcel to be blacktopped to facilitate parking, that in so doing the premises leased herein shall be included in such blacktopping project and the Lessee shall likewise be responsible for its proportionate share of the costs incurred in blacktopping the premises herein leased.
"It is understood and agreed that the Lessee shall likewise have joint and common parking privileges and ingress and egress privileges over the entire parking area of the 1.38 acre parcel in which the premises herein leased is located."
As noted, the trial court awarded defendants the sum of $18,092.50, which was precisely one-half the obligation found to have been incurred by the lessors, or their successors in title, for grading and blacktopping.
Appellant here asserts, as it did during trial, that it had no obligation whatsoever to pay for grading and blacktopping costs on the remainder of the lessors' parcel; that if the lessee was obligated in any amount, it was not liable in the amount ascertained by the trial court. Additionally, appellant asserts that the Sellaros failed to prove the reasonable value of the grading and blacktopping or that the costs, if reasonable, were incurred by the Sellaros, and that the trial court erred in permitting the introduction into evidence of an unverified invoice to prove the alleged cost of the grading and "blacktopping."
That Kentucky Fried Chicken contractually assumed an obligation to pay a proportionate share of grading and paving costs in the project, pursuant to Paragraphs 6. and 7. of the lease, is clear and not in doubt. The extent of such obligation, however, is somewhat obscured by the inartful language which was employed to express the obligation. A comprehensive reading of the entire lease and, particularly, the paragraphs quoted, supra, reveals that the parties contemplated a common parking area involving the entire 1.38 acre parcel which would be available to the appellant upon completion of the grading and "blacktopping." It does not follow, however, that the lessee correspondingly agreed to bear one-half of the entire costs incurred, as the trial court concluded. Indeed, the specific language of the subject provisions negatives such conclusion.
Stripped of the prefatory language pertaining to the inclusion of the appellant's parcel within the entire project, the lessee's obligation is expressed with reference to its proportionate share of the costs incurred in relation to the "premises leased." Paragraph 6. provides, although not as forcefully as Paragraph 7.that the lessors would cause to be graded in preparation for the building "the site leased herein as a part of the overall grading project and the Lessee will pay its proportionate share of the grading costs." While this provision, thus isolated, fails to precisely identify such "proportionate share," Paragraph 7. does.
In Paragraph 7. of the lease, the intent of the parties was clarified. After reciting that the leased premises were to be included in the overall blacktopping project, the lease provides that "the Lessee shall likewise be responsible for its proportionate share of the costs incurred in blacktopping the premises herein leased." (Emphasis supplied). Not only does this provision specifically relate the lessee's obligation to pay the costs incurred in "blacktopping" to "the premises herein leased," it implies, by the use of the word "likewise," concomitant responsibility for the grading costs.
*827 Research indicates that the adjective "proportionate" has not been defined judicially in this jurisdiction. Its common and primary meaning, in a non-legal context is as a term of relativity: comparing or allotting one thing in relation to another. See Webster's New International Dictionary, (2d ed., Unabridged 1958) at 1985: "Proportion;" "Proportionate." In legal instruments and in statutory references, "proportionate" and its synonym "pro-rata" have been employed interchangeably as descriptive adjectives in the relative or comparative sense, also. See, 73 C.J.S. Proportionate, pp. 217-218 (1951); 34A Words and Phrases, "Proportionate," at 430 (1957); Black's Law Dictionary (4th ed. 1951) at 1383; compare, 17 Am.Jur.2d Contracts § 281 (1964). See, e. g.: Hocking Valley Ry. Co. v. Lackawanna Coal & Lumber Co., 224 F. 930 (4th Cir. 1915); Hager v. McDonald, 65 F. 200, 202 (C.C., W.D.Mo., W.D. 1895); United Security Life Ins. Co. v. Dupree, 41 Ala.App. 601, 146 So.2d 91 (1962); Reward Oil Co. v. White, 333 Ill.App. 241, 77 N.E.2d 436 (1948); Hochsprung v. Stevenson, 82 Mont. 222, 266 P. 406 (1928); Schiff v. City of Columbus, 4 Ohio App.2d 234, 211 N.E.2d 917 (1965).
As applied to the lessee's obligation to bear costs of grading and paving under the lease agreement, "proportionate share" relates specifically to the 40 foot by 165 foot parcel, i. e., "the premises herein leased", in comparison to the lessors' obligation to grade and blacktop its entire 1.38 acre parcel. Accordingly, the trial court's allocation of proportionate share, equally between Kentucky Fried Chicken and the Sellaros, was in error. Such allocation to numbers of occupying interests on the 1.38 acre parcel, in disregard of the lease obligation allocating proportionate costs on the basis of the size of the leased parcel in comparison to the whole of the premises, ignores the plain provisions of the lease instrument and its covenants on the subjects of grading and "blacktopping." The erroneous interpretation of the lease provisions and the application of the court's determination of proportionate costs to the dispute requires that the decision appealed from be reversed.
The case must be remanded for further disposition because the designated record presented to this Court neither proves nor disproves that the appellant has borne its paving and grading obligations under the lease. We are not unmindful of the appellant's pleading below or argument here that no part of the grading and paving costs incurred by the lessors was attributable to the leased premises. The record in that respect, however, does not support the entry of judgment for appellant in this Court. Further, as the case was developed and tried on an erroneous theory of allocating costs to the "proportionate share," it appears that no evidence was adduced to prove the cost of grading and "blacktopping" the 5 by 165 foot parcel added to the leased premises by the trial court's reformation ruling. For these reasons, the case is remanded for retrial of appellees' counterclaim for grading and "blacktopping" costs allocable to the leased premises, now being a 45 foot by 165 foot parcel of land.
Since this case must be retried, it is unnecessary to pass upon appellant's specific assignments of error relating to sufficiency of proof and method of proof of damages employed in the trial below. Nevertheless, when this case is retried, the proffer and admissibility of evidence relating to the existence and quantum of damages must be accomplished with due recognition of two familiar principles of compensatory damage law which limit recovery arising from breach of contract on the basis of reasonableness. First, recoverable damages are those "as may fairly and reasonably be considered as arising naturallythat is, according to the usual course of thingsfrom the breach of the contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of its breach." (Emphasis supplied). 22 Am.Jur.2d *828 Damages § 56 (1965) summarizing Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145 (1854). James & Mitchell v. Adams, 8 W.Va. 568 (1875). Accord: Lewis v. Welch Wholesale Flour & Feed Co., 96 W.Va. 694, 123 S.E. 801, 39 A.L.R. 383 (1924); American Surety Co. v. Wheeling Structural Steel Co., 114 F.2d 237 (4th Cir. 1940); Restatement, Contracts § 330 (1932). Secondly, recoverable damages must be proved with reasonable certainty. State ex rel. Mundy v. Andrews, 39 W.Va. 35,19 S.E. 385 (1894); Hare v. Parkersburg, 24 W.Va. 554 (1884); James & Mitchell v. Adams, supra.
The concluding issue involved in this appeal concerns the timeliness of the Sellaros' counter-assignments of error to the judgment of June 21, 1973. Under the authority of Payne v. Kinder, 147 W.Va. 352, 127 S.E.2d 726 (1962), syllabus point 1., appellees contend that Rule XI of the Rules of Practice of this Court permits counter-assignment of error to a judgment from which an appeal or writ of error has been granted by this Court, although the judgment below was entered more than eight months prior to the assertion of the counter-assignment of error. We remain in agreement with that holding and acknowledge that this Court has both jurisdiction and responsibility to consider proper cross-assignments to a perfected appeal from a judgment disposing of a single claim or indivisible claims.
Nevertheless, only a portion of the judgment of June 21, 1973 was appealed to this Court, although that judgment disposed of multiple claims. Appellant moved pursuant to Rules 52 and 59, W.Va.R.C.P. for relief as to that part of the trial court's judgment which awarded lessors' counterclaim for grading and "blacktopping" costs. Neither party filed a timely post-trial motion or appealed the judgment rulings of the trial court disposing of the common parking claim, the reformation of the lease and the award of rentals for the additional 5 by 165 foot parcel added to the leased premises by the "reformation" ruling. Consequently, eight months having passed from the entry of the final judgment disposing of those latter claims, such judgment is final and unappealable. W.Va.Code 1931, 58-5-4, as amended; Rule 72, W.Va.R.C.P.; see Middleton v. Selby, 19 W.Va. 167 (1881).
In a very recent case this Court, speaking through Justice Sprouse, held:
"Where a court, by an order in the first instance, disposes of multiple claims and adjudicates all controversies, but a party by a Rule 59(e) R.C.P. motion asks the court to alter or amend the order as to one of the claims, but not the other, the Rule 59(e) motion extends the time of finality of the order as it relates to the claim contained in the 59(e) motion until the Rule 59(e) motion is determined, but the order in the first instance is final as to the other claims determined therein, and the time for appeal as to that claim runs from the entry of the order in the first instance." Syllabus point 6., Dixon v. American Industrial Leasing Co., W.Va., 205 S.E.2d 4 (1974).
We are of the opinion that the disposition of that case, similarly refusing consideration of counter-assignments of error relating to unappealed portions of a multiple judgment, is controlling here. The appellees' counter-assignments are untimely and cannot be considered on this appeal.
The final order of the Circuit Court of Monongalia County is reversed and the case is remanded with directions for retrial in accordance with the principles expressed in this decision.
Reversed and remanded with directions.
SPROUSE, Justice (dissenting):
I respectfully dissent from that part of the majority opinion holding the formula for apportioning paving costs between the parties is determined solely by the size of appellant's lot. The appellant has the right to use the entire parking lot for customer parkingit should pay its share for this *829 privilege. If there is not sufficient evidence in the record demonstrating the intention of the parties as to how much of the paved area each would use for parking, that part of the case should be remanded to develop these facts.
NEELY, Justice (dissenting):
I must respectfully dissent from the last section of the majority opinion dealing with the timeliness of cross-appeals. The majority opinion unnecessarily distinguishes established precedent and ignores the plain meaning of Rule XI of the Rules of the Supreme Court of Appeals.
The 1962 decision of Payne v. Kinder, 147 W.Va. 352, 127 S.E.2d 726 (1962) dealt with a factual situation identical to the one presented here. The following summary and disposition of the issue in Payne may be found at 147 W.Va. at 360-1, 127 S.E.2d at 732-3:
"The plaintiff challenges the right of the defendant to cross-assign error upon this appellate review of the case. She contends that inasmuch as the counter assignment was not filed until more than eight months after September 28, 1961, when the judgment of the circuit court was rendered, it was not filed within the time permitted by the statute relating to petitions presented to this Court for appeal or writ of error, and that in so far as Rule XI of this Court permits counter assignment of error to be filed after the expiration of eight months from the entry of the final judgment, the rule contravenes the statute and for that reason is invalid and of no force and effect.

"The foregoing contention of the plaintiff is devoid of merit. The statute in question, Section 4, Article 5, Chapter 58, Code, 1931, provides that `No petition shall be presented for an appeal from, or writ of error or supersedeas to, any judgment, decree or order, whether the State be a party thereto or not, which shall have been rendered or made more than eight months before such petition is presented.' It does not relate to assignment or counter assignment of error upon the hearing of the case after an appeal or a writ of error has been granted. Rule XI does not deal with the petition for appeal or writ of error but relates to and governs the counter assignment of error by the appellee or the defendant in error in any case in which an appeal or a writ of error has been granted. There is no conflict between the statute and the rule and each of them deals with a different phase of litigation. The statute has no application to counter assignment of error and Rule XI which deals with the subject, is a valid rule of this Court. Under Rule XI of the Rules of Practice in the Supreme Court of Appeals an appellee or a defendant in error may cross-assign error which in his opinion is prejudicial to him and call attention to such error by counter assignment of error filed at the hearing of the case or by pointing out and complaining of such error in his brief; and the statute which requires a petition for appeal or writ of error to be presented within eight months after judgment, decree or order has been rendered or made does not apply to or govern the counter assignment of error in a case in which an appeal or a writ of error has been granted by this Court. As the defendant has complied with the requirements of that rule, his counter assignment of error is properly before this Court for consideration in the decision of this case." [Emphasis supplied]
In conducting legal research, it is a rare occasion, indeed, when one finds a case any more squarely on point for a given legal principle than the Payne decision as it relates to the case sub judice. Yet the majority opinion attempts to distinguish Payne on the issue of single, indivisible claims versus multiple or divisible claims. While upholding Payne with regard to indivisible claims, the majority opinion refuses to consider appellee's counter-assignments of error relating to those portions of a multiple judgment favorable to appellant on the *830 grounds that the cross-appeal is a separate, divisible claim, citing syllabus point 6 in Dixon v. American Industrial Leasing Co., W.Va., 205 S.E.2d 4 (1974) which says:
"Where a court, by an order in the first instance, disposes of multiple claims and adjudicates all controversies, but a party by a Rule 59(e) R.C.P. motion asks the court to alter or amend the order as to one of the claims, but not the other, the Rule 59(e) motion extends the time of finality of the order as it relates to the claim contained in the 59(e) motion until the 59(e) motion is determined, but the order in the first instance is final as to the other claims determined therein, and the time for appeal as to that claim runs from the entry of the order in the first instance."
As I believe that the majority's decision today serves a pernicious public policy, I am all the more distressed that the logic which employs Dixon to repudiate Payne is less than persuasive. A cursory reading of both opinions immediately reveals that Payne involved a cross-appeal while Dixon did not. In Dixon, plaintiffs instituted an action to which the defendant filed an answer and counterclaim. The trial court severed the claims and ordered two separate trials. The defendant's counterclaim was tried first and the court held in favor of the defendant. On December 21, 1970 plaintiffs moved to set aside the verdict or to grant a new trial. The court did not rule on the motion at that time. On June 22, 1971, regarding plaintiffs' original claim the defendant moved to dismiss for failure to join an indispensible party. On July 12, 1971, the court, in one order, ruled on both motions, each of which held against the plaintiffs. Within ten days the plaintiffs moved to set aside the order to the extent that it granted defendant's motion to dismiss for plaintiffs' failure to join the indispensible party. On October 7, 1971, almost 90 days later, the court overruled plaintiffs' motion. Eight months later (to the day) on June 7, 1972, plaintiffs filed an appeal as to both issues decided by the July 12, 1971 order. Immediately after the appeal was docketed, the defendant moved to dismiss as improvidently awarded that portion of the appeal concerning the counterclaim.
This Court held that eight months after the July 12, 1971 order was entered, the trial court's ruling regarding the counterclaim became final because the plaintiffs had moved to set aside that order only with regard to the issue of dismissal for failure to join the indispensible party, in other words only that divisible issue was timely filed. Therefore the Court refused to hear anything more with regard to the appeal of defendant's counterclaim. Thus, no counter-assignment of error or cross-appeal appeared at all in Dixon but, rather, that case involved only a direct appeal by the plaintiff-appellant as to two divisible claims arising from the order of the lower court. Nowhere does the opinion mention or involve a cross-appeal.
The ruling in Dixon, quoted above, is correct with regard to the subject matter about which it was writteni. e. the timeliness of filing appeals of multiple claims by one appellant. It is an appellant who institutes the appeal; it is an appellant who wishes to perpetuate the controversy because of dissatisfaction with the lower court's ruling; and, therefore, it is correct to assume that an appellant should know immediately those issues he wishes to challenge on appeal.
Thus it is with regard to appellants that the Legislature enacted the statutory eight month filing period for appeals in W.Va. Code, 58-5-4 [1931]. However, as a result of today's majority opinion, it is now necessary that a party who is substantially satisfied with an entire law suit, yet aggrieved by one particular adverse holding, will be compelled to appeal the judgment acceptable in its entirety, in order to protect himself in the event of an appeal by the other side, although he would prefer neither to see the inside of an appellate court nor underwrite the expense attendant on an appeal.
*831 The Dixon opinion says nothing regarding cross-appeals, and, therefore, it should not serve as precedent to modify Payne or to negate the policy of Rule XI on the cross-appeal issue. While it is true that the overwhelming majority of foreign jurisdictions require that cross-appeals be filed within the statutory period for appeals, our former brethren on this Court sought a different rule for West Virginia when they promulgated Rule XI in 1934. If a majority of the present Court should wish to change the West Virginia Rule, then they may do so directly rather than by confusing and unsettling case law.
Rule XI clearly states:
"In any appeal or writ of error, if error is perceived against the appellee or defendant in error, the court will consider the whole record as being before it, and will reverse the proceedings, either in whole or in part, and in the same manner as it would were the appellee or defendant in error to assign errors and bring the case before the court, unless such error be waived by the party prejudiced thereby. It is, however, advisable for the appellee or defendant in error, if he is of opinion that there is error in the record to his prejudice, to call attention to the same by a formal counter-assignment of error filed at the hearing of the case, or by pointing out and complaining of the same in his brief."
The first sentence of the Rule indicates that it is not even mandatory that the appellee assign error for the court to consider errors to his prejudice. That is, "if error is perceived against the appellee . . . the court will consider the whole record as it would were the appellee . . . to assign errors and bring the case before the court, unless such error be waived by the party prejudiced thereby."
The second sentence of Rule XI goes on to provide that "it is, however, advisable" that the appellee formally assign errors prejudicial to himself to be "filed at the hearing of the case, or by pointing out and complaining of the same in his brief." Despite the fact that this second sentence is merely precatory and not mandatory the appellees in the instant case complied with the "advisable" provision by counter-assigning error both in their brief and at the hearing of the case. The Rule says nothing concerning any eight month filing period and it says nothing concerning indivisible versus multiple claims. Consequently, the assignments of error raised by the appellees should have been heard by this Court and a determination made on their merits.
Let us now look at the facts of this case from a practical point of view with due regard for the generally accepted purpose of courts to resolve conflicts expeditiously and inexpensively. There were two basic issues at the trial level: the encroachmentlease reformation issue and the parking lotpaving cost issue. In a sense, each party "won" one of the issues. The appellant was granted reformation of the lease agreement and gained the strip of land upon which he had encroached at the same cost per foot as the original rental property. The appellees received more money toward the cost of paving the joint parking area than the lease agreement contemplated.
The appellees were satisfied with the trial court ruling. The appellees' share of the paving cost in excess of the amount mandated in the lease agreement was sufficient to counteract their dissatisfaction with the reformation of the lease. The appellant, on the other hand, wanted a favorable judgment in all respects and was not amenable to accepting the judicially apportioned half loaf. Consequently, the majority opinion allows the appellant to retry that part of the original ruling he did not like while at the same time foreclosing appellate review of the issue of encroachment which the appellees had been willing to waive in return for that part of the judgment favorable to them.
Today's ruling greatly increases the cost of multi-claim litigation because it mandates the filing of exclusively defensive appeals *832 which satisfied litigants do not want. Appeals, defensive or otherwise, are costly. Papers must be drafted by lawyers who, in turn, must be paid for their time; transcripts must be prepared; and, travel, postage, and reproduction expenses must be incurred.
Rather than helping to make procedural rules the vehicle for resolving controversies on the merits, today's majority decision introduces yet another irrational intricacy into the incomprehensible, high-stakes game of "Mother may I?" which we call procedural law. Henceforth it will always be in the interest of any party in multiclaim litigation who has profited by error in one part of the litigation, but who is aggrieved by another part, to wait until just before the expiration of the eight month appeal period to file an appeal in an effort to ambush the other side, who may be satisfied with the overall result of the law suit. Accordingly an ambush conscious attorney will appeal a judgment with which he is substantially satisfied to protect his client, in spite of the fact that he would disclaim to the court any real desire to have the appeal granted unless the other side successfully seeks a writ of error. If this makes good sense, then I have misunderstood the role of courts.
The object of law is conflict resolution and neither full employment for lawyers nor courtroom participation for litigants. Today's decision strikes an unintentionally disastrous blow at conflict resolution and does nothing but help to perpetuate conflict and to increase litigation costs.